William FIGUEROA, Plaintiff,

v.

Helen DEAN, Superintendent for
Programs, Defendant.

No. 99 Civ. 12457(RWS).

United States District Court,
S.D. New York.

March 31, 2006.

Katten Muchin Zavis Rosenman, New
York, NY (Julie Pechersky, Joanna M.
Bernard, of counsel), for Plaintiff.

Honorable Eliot Spitzer, Attorney General
of the State of New York, New York,
NY (Lisa Fleischmann, Assistant Attorney

General, Julia Lee, Assistant Attorney General, of counsel), for Defendant.

## OPINION

SWEET, District Judge.

Defendant Helen Dean ("Defendant" or "Dean") has moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P., against plaintiff William Figueroa ("Plaintiff" or "Figueroa"). For the reasons set forth below, Dean's motion for summary judgment on the merits is granted, Dean's motion for summary judgment on the ground of failure to exhaust is denied as moot, and Figueroa's complaint is dismissed in its entirety.

### Prior Proceedings

Figueroa filed his complaint in the district court for the Western District of New York on July 23, 1999. At all times relevant to the complaint he was incarcerated at Wende Correctional Facility ("Wende"). In the complaint he alleged that Dean, the Deputy Supervisor for Programs at Wende, violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., and the Rehabilitation Act, 29 U.S.C. § 794 et seq., because she (1) did not provide qualified sign language interpreters for medical and dental appointments, as well as educational and vocational programs; (2) did not provide visual fire alarms; (3) limited his access to the text telephone; and (4) denied his request for a television with a closed-caption device.

On October 27, 1999, the attorney then representing Figueroa filed a motion seeking a change of venue to the Southern District of New York, and on December 21, 1999, the Honorable William M. Skretny of the Western District upon consent granted the motion. The motion was premised on this Court's consent decree in *Clarkson v. Coughlin*, 91 Civ. 1792,[1] (the "Consent Decree").

On May 14, 2002, Dean moved to dismiss Figueroa's complaint for improper venue or, alternatively, to transfer venue back to the Western District of New York. In an opinion dated October 30, 2002 and entered November 1, 2002, this Court held that venue was proper and that Plaintiff's complaint would be treated as a motion for contempt under the Consent Decree. *Figueroa v. Dean*, Nos. 99 Civ. 12457(RWS) & 99 Civ. 12458(RWS), 2002 WL 31426205, at *1, *4 (S.D.N.Y. Oct. 30, 2002).

On January 6, 2004, Dean filed a motion for summary judgment on the ground that Figueroa had failed to exhaust his administrative remedies under the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). Figueroa filed opposition to this motion on March 11, 2004, and oral arguments were heard on April 21, 2004.

On October 26, 2004, Defendant was granted leave to file a motion for summary judgment on the merits as well as a supplemental brief on the issue of exhaustion under the PLRA. Both papers were submitted on February 1, 2005 and Plaintiff's

---

**1.** *Clarkson* was commenced in this Court as a class action, brought on behalf of hearing-impaired inmates in the custody of the Department of Correctional Services ("DOCS"). In 1995 this Court granted summary judgment awarding declaratory relief, *Clarkson v. Coughlin*, 898 F.Supp. 1019 (S.D.N.Y.1995), and on June 6, 1996, the Court approved a consent judgment and order (the "Consent Decree") granting extensive relief on behalf of the class ("Clarkson Class").

The Clarkson Class consists of two subclasses, the first of which comprises "all present and future deaf and hearing-impaired male inmates of the New York State Department of Correctional Services who have been, are, or will be discriminated against, solely on the basis of their disability, in receiving the rights and privileges accorded to all other inmates." Consent Decree at 2. Figueroa contends that he is a member of this subclass.

opposition was filed on May 12, 2005. Dean filed a reply in support of the motion for summary judgment on the merits on May 26, 2005, and oral arguments were heard June 8, 2005, on which date both motions were marked fully submitted.

In his memorandum of law in opposition to the motion for summary judgment on the merits, Figueroa for the first time raised a claim regarding the lack of an ombudsperson at Wende as mandated by the Consent Decree. Because Figueroa did not plead any facts on the face of the complaint to support this claim, it will not be considered in the instant motion.

### Relevant Provisions of the Consent Decree

The Consent Decree provides a wide range of relief to correct violations of hearing-impaired inmates' federal right. Among other things, the Consent Decree sets forth the time and manner in which inmates must be informed of their rights to reasonable accommodations and the procedure by which inmate requests for accommodations should be considered. Under the Consent Decree, inmate requests can be made orally or in writing to any Department of Correctional Services ("DOCS") or Office of Mental Health ("OMH") employee. If a request made to a DOCS or OMH employee is denied, the inmate must be advised of his/her right to renew the request by contacting the DOCS superintendent or OMH satellite unit chief. Consent Decree ¶ 5. Upon receiving a request, a DOCS superintendent or his designee should grant it or, if necessary, arrange to meet with the inmate within twenty-four hours to discuss the request. A decision must be made within one week of receiving the request, and if the request is denied, the inmate shall be advised of his right to grieve the decision under the Inmate Grievance Program, *id.* ¶ 6, which DOCS shall make accessible to deaf and hard of hearing inmates, *id.* ¶ 9. All such

grievance decisions are to be forwarded to the Office of Diversity Management, which will, in turn, review the denial of requests for accommodations. *Id.* ¶ 10.

The Consent Decree requires DOCS to provide deaf and hard-of-hearing inmates with "the auxiliary aids, services and assistive devices necessary to facilitate full and effective participation in prison programs, activities and services." *Id.* ¶ 20. Auxiliary aids, services and devices may include, *inter alia,* qualified sign language interpreters, text telephone ("TTY/TDD"), closed-caption television/VCR decoders, and visual smoke detectors and fire alarms. *Id.* A sign language interpreter, whether a member of facility staff or an inmate, is considered "qualified" if certified by a national or New York State credentialing authority or if able to interpret "effectively, accurately, and impartially both receptively and expressively." *Id.* ¶ 4(d).

DOCS is required to provide reasonable accommodations, including sign language interpreters where necessary, for hearing-impaired inmates who request, and are eligible for, medical, dental, or mental health treatment "when communication between patient and medical personnel is critical to the efficacy of treatment or the safety and security of the inmate." *Id.* ¶ 24. Due to the need for confidentiality, inmate interpreters may not be used in these settings except in case of an emergency. *Id.*

Reasonable accommodations, including sign language interpreters where necessary, are required for hearing-impaired inmates at all counseling sessions and for educational and vocational programming. *Id.* ¶ 25. In the counseling setting, inmate interpreters may not be used where either the inmate or the counselor wishes to discuss confidential information. *Id.* Inmate

interpreters may be used for educational and vocational programming. *Id.*

The Consent Decree requires DOCS to provide closed captioned television and VCR decoders to hearing-impaired inmates in the same amount and for the same duration of time as these devices are afforded to inmates who can hear. *Id.* ¶ 31. The Consent Decree also requires that all hearing-impaired inmates be afforded access in the same amount and with no additional restrictions to TTY/TDD telephone service as is afforded to hearing inmates, except that inmates using text telephones are to be afforded double the amount of time allotted for hearing inmate phone calls. *Id.* ¶ 32.

Additionally, in areas in which inmates with hearing disabilities reside or can otherwise be expected to be present, DOCS is required to provide visual alarms or warning systems, or equally effective manual means of notification, to alert hearing-impaired inmates to emergencies, counts, or other matters of importance. *Id.* ¶ 34.

Many, if not all, of the Consent Decree requirements have been incorporated into the published policies of DOCS and Wende. DOCS Directive No. 2612 ("Directive 2612"), titled "Inmates with Sensorial Disabilities," addresses, *inter alia*, the needs of hearing-impaired inmates and tracks much of the language of the Consent Decree. Wende Policy and Procedure No. 2312 ("P & P 2312") governs inmate phone calls at Wende, and makes specific provisions for the use of TTY by hearing-impaired inmates. Wende Policy and Procedure No. 2310 ("P & P 2310") governs the use of television sets in inmates' cells, and specifically addresses the availability of closed-captioned televisions for hearing-impaired inmates.

### Facts

The facts are taken from the record and both parties' Statements of Material Facts Pursuant to Local Civil Rule 56.1. The facts are not in dispute except as noted below.

At all times relevant to the complaint, Figueroa resided at Wende, which is a maximum security facility housing approximately 900 inmates. At all relevant times, Dean was the Deputy Superintendent of Programs at Wende. Figueroa was born deaf, and contends that he is a member of the class protected by the Consent Decree.

Most deaf and hard-of-hearing inmates at Wende currently are housed in D Block. At the time of his complaint, Figueroa was housed in D Block, although at other times during his incarceration at Wende he has been housed in B Block, the Segregated Housing Unit ("SHU"), and the mental health unit ("ICP"). Figueroa uses hearing aids and can communicate using American Sign Language. He can also lip-read individuals speaking English and Spanish, but has expressed difficulty reading lips when communicating with English-speaking staff at the prison.

Corrections counselor John Cabrera ("Cabrera") was assigned to work as Figueroa's counselor when Figueroa was housed in D Block. On each occasion when Cabrera met with Figueroa for a scheduled appointment, there was an interpreter present. When Cabrera met with Figueroa informally (without an appointment) he and Figueroa could communicate without the assistance of an interpreter by writing or some talking.

On January 13, 1997, Figueroa requested, through a reasonable accommodations form, the following accommodations: TTY/TDD, closed-captioned television, interpreter services, and hearing aids and batteries. Figueroa states that he had hearing aids prior to his incarceration at Wende, and an Ambulatory Health Record from Wende dated January 28, 1999 makes clear that Figueroa was in possession of hearing aids at that time. A set of hearing

aids was issued to Figueroa by Wende in 2000.

### 1. *Interpreters*

In 1998 and 1999, Wende shared two staff interpreters, Laurie Mamo and Barbara Seeley, with the nearby Wyoming Correctional Facility. Figueroa testified at deposition that Ms. Sealy was certified from the time he arrived at Wende, but that Ms. Mamo initially was not certified. After Figueroa complained about her lack of certification, she became certified. In 2001, Wende hired a full-time staff interpreter, Ann Andzel. Since her hiring, Ms. Andzel has interpreted for Figueroa at numerous medical appointments, grievance hearings, and other occasions. In addition to Ms. Andzel, Wende also utilizes inmate interpreters, and staff interpreters from Wyoming Correctional Facility still occasionally interpret for Wende inmates. Prior to 2001, if an inmate needed to communicate with a corrections officer immediately and an interpreter was not available, communicating by paper and pencil was considered a reasonable accommodation. Ms. Andzel testified at deposition that sign language services for Wende inmates has changed for the better since 2001.

Since 1998, inmate interpreters have been used for educational and vocational classes at Wende. In classes in which videos are used, Wende provides closed-captioned text displays for hearing-impaired inmates. At deposition, Figueroa testified that he was not satisfied with the inmate interpreters provided for classes and programs at Wende when staff interpreters were not available. Specifically, he felt that the use of inmate interpreters was "not professional," and resented that inmate interpreters did not always understand him when he "was very fast" and asked him to slow down. Figueroa gave conflicting testimony as to whether he complained to Dean about the situation at the time, and also stated that Dean "didn't care."

Figueroa also testified that at "various times" he was not provided with an interpreter for medical and dental appointments, and had to undergo flu shots and blood tests without an interpreter. Figueroa also testified that in some cases he was able to communicate with a nurse with a mix of lip reading and signing. In 1998 and 1999, Wende did not have a policy requiring medical practitioners to note the presence of an interpreter in an inmate's medical record, as it does today. It is undisputed that at all relevant times Wende policy required the use of staff interpreters for situations involving confidential communication, such as medical, dental, and counseling appointments. Figueroa testified at deposition that he did not complain to Dean about the lack of a staff interpreter for medical appointments because he "was afraid of being punished."

### 2. *Visual Fire Alarms*

It is undisputed that Wende currently has visual fire alarms in D Block, SHU, and all program areas. These alarms are placed about eight feet high on the cellblock wall and are visible from the cells. When the fire alarms are activated, lights flash and an audio alarm sounds. The alarms are inspected on a regular basis in accordance with the Wende Fire Emergency Procedures.

Although Figueroa stated in his complaint that there were no visual fire alarms for hearing-impaired inmates, he testified at his deposition only that the alarms on B and D Blocks were "very old" at the time of his complaint. Fellow Wende inmate John Duquin testified at deposition that on at least one occasion in or about November 1998 there was no flashing light or alarm in his cell during a cellblock fire.

A November 30, 2001 email from Dean to Donna Masterson, ADA Coordinator at Wende, notes the need for "audio visual units (strobe lights)" for units housing hearing-impaired inmates. Masterson testified in her deposition that the units already had visual fire alarms at the time the email was sent, and that Dean was specifically requesting strobe lights as opposed to the existing visual alarms.

Additional email correspondence between several Wende administrators questioned the need for flashing alarms in locked areas as long as there was an established procedure for manually notifying hearing-impaired inmates of emergencies. Because Wende is a maximum-security facility, inmates are not allowed freedom of movement even during emergencies. The cell doors and all gates between areas must be unlocked by officers. The correction officers are trained to make sure that, in the event of a fire, all cells and appropriate gates are unlocked and inmates are evacuated. Figueroa contends that such procedures were not followed on at least two occasions during fires where no one came to notify him to leave his cell. He also testified at deposition that cell block fires occurred several times a week.

On April 8, 2002, Figueroa filed a grievance complaining that the visual smoke detector on D Block was old and that the light was weak. In response, the IGRC noted that the cellblocks were already equipped with flashing smoke alarms but recommended that "stronger detectors" be installed due to the special needs of hearing-impaired inmates.

### 3. *TTY Telephone Access*

DOCS and Wende policy on inmate access to TTY is clearly established. Directive 2612 provides that access to TTY by hearing-impaired inmates shall be equivalent to access to telephone service for hearing inmates, except that TTY users will be granted twice the amount of time to communicate. P & P 2312 establishes that calls by hearing inmates will be limited to ten minutes if other inmates are waiting, and that no call will exceed thirty minutes. In accordance with the Consent Decree and Directive 2612, P & P 2312 also provides that TTY calls will be limited to twenty minutes if other inmates are waiting, and that no call shall exceed sixty minutes. Prior to 2000, the allowable length of calls was ten and twenty minutes for hearing and hearing-impaired inmates, respectively, regardless whether other inmates were waiting to use the telephone. All inmates may be subject to telephone use restrictions, such as only being allowed to use the telephone on certain days or losing telephone privileges entirely as a result of disciplinary action.

In 1998 and 1999, the TTY for B Block (the unit in which deaf and hard-of-hearing inmates then resided) was located in the B Block sergeant's office. Inmates wishing to use the TTY had to ask the officer for access and if the office was being used by staff, the inmate had to be rescheduled. After inmates filed grievances about this procedure, the policy and the location of the TTY were changed. When Figueroa first resided in B Block, he was only allowed to use the TTY for five minutes per call, but that time was later increased to twenty minutes. If Figueroa knew the staff members and they liked him, he was sometimes allowed to use the TTY for up to an hour.

On July 15, 1999, Figueroa filed a grievance alleging that he was only allowed to use the TTY telephone for ten minutes at a time, rather than twenty minutes as required by P & P 2312. After a hearing, the Inmate Grievance Review Committee ("IGRC") agreed that Figueroa should be allowed to use the TTY for twenty minutes per call.

A memorandum dated April 11, 2000 from Robert Raymond, Affirmative Action Administrator in the Office of Diversity Management, to Donna Masterson, ADA Coordinator, stated that Figueroa was being housed in the ICP, which did not have a TTY. Raymond acknowledged this was a problem, but reported that a TTY unit had been ordered and received, and was only awaiting the installation of a telephone line. Raymond also indicated that as a temporary measure, Figueroa was allowed to make TTY calls from the correction counselor's office two or three times per week, at least during periods when he had not lost telephone privileges for disciplinary reasons.

Correction Counselor John Cabrera testified that Figueroa never complained to him about TTY telephone access. Cabrera testified that both hearing and hearing-impaired inmates have to request use of the telephone, and must use the telephone in accordance with a schedule. In contrast, Figueroa's fellow inmate John Duquin testified that hearing inmates are able to use the telephone at any time without sergeant approval.

### 4. Closed–Captioned Television

As of December 28, 2000, closed-captioned televisions were located in the following public areas in Wende: all recreation yards, B Block yard, C Block yard, E Block yard, the third floor of E Block (the protective custody unit), ICP yard, and the Gallery. Wende inmates who wish to have a television in their cell must obtain it from the commissary. A hearing-impaired inmate who desires the use of a closed-captioned television must file a slip encumbering his inmate account for $87.99, and he will be loaned a facility television with a closed-caption decoder for use during his stay at Wende. When the inmate leaves Wende, the encumbrance will be released from his account if the television is in the same condition save for normal wear and tear.

Inmates at Wende are not permitted to have a television in their cells during periods of disciplinary confinement. Figueroa did not have television privileges from August 4, 1997 to January 12, 1999 and from January 27, 2000 to April 28, 2000 as a result of disciplinary infractions. Figueroa stated at deposition that he tried to buy a television from the commissary but acknowledged that "I lost my privileges because I've been punished so much."

### Discussion

### Figueroa's Complaint Is Not Subject to the Exhaustion Requirements of the PLRA

■ Defendant's January 6, 2003 motion for summary judgment sought the dismissal of Figueroa's complaint in its entirety on the ground that Figueroa had failed to exhaust his administrative remedies as required by the PLRA. It is undisputed that claims under the ADA and Rehabilitation Act must be exhausted via the grievance procedure established under the PLRA. *Clarkson v. Coughlin*, No. 91 Civ. 1792(RWS), 2006 WL 587345, \*\*2–3, 2006 U.S. Dist. LEXIS 9676, at \*8 (March 6, 2006). However, the exhaustion requirement of the PLRA does not apply to actions that seek exclusively to enforce the Clarkson Consent Decree. *Id.*

This Court has already held that Figueroa's complaint is to be treated as a contempt action to enforce the Clarkson Consent Decree. *Figueroa v. Dean*, Nos. 99 Civ. 12457(RWS) & 99 Civ. 12458(RWS), 2002 WL 31426205, at \*1, \*4 (S.D.N.Y. Oct. 30, 2002). Figueroa has also confirmed that he is no longer pursuing claims under the ADA and the Rehabilitation Act. Pl.'s Mem. Opp'n Def.'s Mot. Summ. J., at 4 (May 12, 2005). Since the action seeks exclusively to enforce the Clarkson Con-

sent Decree, it is not subject to the exhaustion requirements of the PLRA, and Defendant's motion for summary judgment on that ground is hereby denied as moot.

### Standard for Summary Judgment on the Merits

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The moving party has the initial burden of showing that there are no material facts in dispute, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

■ The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987); *Eastway Constr. Corp. v. New York*, 762 F.2d 243, 249 (2d Cir.1985). However, the Court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, where "substantive law compels a heightened evidentiary scrutiny, a court must apply such scrutiny at the summary judgment stage," *Helmsley–Spear, Inc. v. Westdeutsche Landesbank*, 692 F.Supp. 194, 203

(S.D.N.Y.1988) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505), and grant summary judgment where the nonmovant's evidence is not sufficiently probative. *See Anderson* at 249–50, 106 S.Ct. 2505.

■ "The imposition of a civil contempt order is a severe sanction subject to a higher standard of proof than the 'preponderance of the evidence' standard applicable to ordinary cases." *King v. Allied Vision Ltd.*, 155 F.R.D. 440, 448 (S.D.N.Y. 1994) (internal quotations and citations omitted). The Court should exercise this inherent power only when "the proof of noncompliance is clear and convincing ... and ... the party has not diligently attempted in a reasonable manner to comply." *Scottish Air Int'l v. British Caledonian Group, PLC*, 867 F.Supp. 262, 266 (S.D.N.Y.1994).

To properly resolve the instant motion the Court first must determine whether Dean has demonstrated the absence of any genuine issues of material fact. If so, the Court must inquire whether Figueroa has adduced specific facts sufficient for a jury to find that (a) proof of Dean's noncompliance with the Consent Decree is clear and convincing, and (b) Dean has not diligently attempted in a reasonable manner to comply with the Decree.

### The Motion for Summary Judgment on the Merits Is Granted

■ For each claim and request for relief in Figueroa's complaint, Dean has met her initial burden of showing no genuine dispute of material fact as to either (a) her compliance with requirements of the Consent Decree, or (b) her diligent attempt to comply in a reasonable manner. Because Figueroa has not met his subsequent obligation to put forth specific facts supporting a finding of contempt, the motion for summary judgment on the merits is granted.

### 1. *Sign Language Interpreters*

Dean has met her burden of demonstrating the absence of any genuine dispute of material fact as to (a) the availability of both staff and inmate interpreters at Wende and (b) Dean's diligent efforts to comply with the requirements of the Consent Decree on this issue. The established policies of DOCS and Wende regarding interpreters closely track the language of the Consent Decree. The record shows that for educational and vocational programming, Figueroa was provided with the services of an inmate interpreter as well as other accommodations such as closed-caption displays on videos. Evidence also shows the regular attendance of staff interpreters at medical and counseling appointments. Furthermore, all indications are that Dean and Wende have made a consistent effort to improve interpretation services and comply with the Consent Decree by ensuring that staff interpreters are certified, hiring a full-time staff interpreter, and requiring medical records to note the presence of an interpreter at appointments.

In response, Figueroa fails to provide specific facts sufficient to avoid summary judgment. Figueroa does not assert any specific dates or times when Dean failed to provide a sign language interpreter when one was required to be present. While he does allege that "at various times" he did not have the assistance of an interpreter for dental appointments and routine medical procedures such as blood tests and flu shots, Figueroa does not argue that the presence of an interpreter in any of these instances was "critical to the efficacy of the treatment or the safety and security of the inmate." Figueroa also acknowledges that he did not complain to Dean about the lack of an interpreter during medical appointments because he "was afraid of being punished."

Figueroa does not dispute the presence of inmate interpreters at vocational training and disciplinary hearings or Wende's use of videos and other technical devices to better accommodate hearing-impaired inmates. Instead, Figueroa complains that the inmate interpreter with whom he was provided did not work quickly enough and could not keep up with Figueroa. While frustrating, such dissatisfaction alone does not support a claim for contempt under the Consent Decree.

### 2. *Visual Fire Alarms*

Here, too, Defendant Dean has met the initial burden that is placed on one who moves for summary judgment. It is undisputed that Wende is currently equipped with visual fire alarms that meet the requirements of the Consent Decree. Even assuming that Wende was not always equipped with visual alarms, email correspondence between Wende administrators acknowledges a policy and procedure that in emergency situations correction officers are responsible for unlocking each cell door and ensuring that inmates evacuate. The Consent Decree explicitly provides for such "equally effective manual means of notification." In addition, the Wende staff email correspondence and the IGRC recommendation that strobe lights be installed demonstrate a commitment to compliance with the requirements of the Consent Decree.

Figueroa does not respond with facts sufficient for a jury to find by clear and convincing evidence that Dean is in contempt of the Consent Decree. His own deposition testimony and grievances filed at Wende indicate that he was upset about the quality of the existing visual alarms rather than their absence. His testimony that on two occasions over the course of several years he was not personally notified by correction officers in an emergency

does not establish a clear violation of the Consent Decree. Nor does he make any showing that Dean did not attempt diligently to comply with the requirements of the Consent Decree.

### 3. TTY Telephones

Figueroa's next claim focuses on the availability of TTY telephones; specifically, his contention that Wende did not provide equivalent access to TTY for hearing-impaired inmates as compared with hearing inmates' access to telephone service.

While Dean cannot show the absence of any genuine dispute of material fact regarding access to TTY, she has met her initial burden with respect to her diligent efforts to comply with the Consent Decree. The record shows that at various times prior to 2001 certain areas within Wende provided only limited access to TTY, while other areas (such as the ICP) lacked TTY altogether. It is also undisputed that, while DOCS and Wende policies follow closely the provisions of the Consent Decree regarding TTY, Figueroa was not always afforded the full time per call allowable under these policies. Yet the record also is replete with examples of Defendant's diligent efforts to comply with the Consent Decree. On each occasion when Figueroa filed a grievance or otherwise complained about access to TTY, Dean and other DOCS staff responded with temporary accommodations and permanent improvements.

Figueroa has not met this showing by Defendant with specific facts giving rise to a genuine dispute about material facts regarding Dean's diligent efforts to comply with the Consent Decree. Rather, the facts offered by Figueroa go to the question of Wende's compliance with the equivalent access provisions of the Consent Decree. As previously stated, the Court should find a party in contempt only when "the proof of noncompliance is clear and

convincing ... and ... the party has not diligently attempted in a reasonable manner to comply." *Scottish Air Int'l,* 867 F.Supp. at 266.

### 4. Closed–Captioned Televisions

Figueroa has acknowledged that he lost his television privileges due to disciplinary problems and thus is no longer pursuing his claims regarding closed-captioned televisions. Pl.'s Mem. Opp'n Def.'s Mot. Summ. J., at 13 (May 12, 2005).

### 5. Ombudsperson

In his memorandum of law in opposition to the motion to dismiss, Figueroa for the first time raises a claim regarding the lack of an ombudsperson at Wende. Because Figueroa did not plead any facts on the face of his complaint concerning the lack of an ombudsperson, the Court will not address this claim in the instant motion.

### Conclusion

For the foregoing reasons, Dean's motion for summary judgment on the merits is granted, Dean's motion for summary judgment against Figueroa on the ground of failure to exhaust is denied as moot, and Figueroa's complaint is dismissed in its entirety.

It is so ordered.