George ARCE, Plaintiff,

v.

James O'CONNELL, Joseph J. Costello, Roseann Mahoney, David Napoli, Skip Hughes, Dwight Hunt, Edward R. Donnelly and M. Kearney, Defendants.

No. 02 Civ. 1709(RWS).

United States District Court, S.D. New York.

April 13, 2006.

Katten Muchin Rosenman, New York City (Joanna M. Bernard, Julie Pechersky, of Counsel), for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York, New York City (Lisa Fleischmann, Julia Lee, Assistant Attorneys General, of Counsel), for Defendants.

## OPINION

SWEET, District Judge.

Defendants James O'Connell, Joseph J. Costello, Roseann Mahoney, David Napoli, Skip Hughes, Dwight Hunt, Edward R. Donnelly, and M. Kearney (collectively, "Defendants"), all employees of the New York Department of Correctional Services ("DOCS"), have moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P., against inmate plaintiff George Arce ("Arce" or "Plaintiff"). For the reasons set forth below, Defendants' motion for summary judgment is granted, and Arce's complaint is dismissed in its entirety.

### Prior Proceedings

Arce commenced this action on March 5, 2002 by the filing of a *pro se* complaint. Arce, who contends that he is hearing-impaired, alleged that Defendants violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et *seq.*, as well as the Eighth and Fourteenth Amendments, by failing to provide reasonable accommodations for his hearing impairment and retaliating against him after he filed grievances regarding the lack of such accommodations. Counsel was appointed to represent Arce on October 17, 2002.

Arce's status as a DOCS inmate who is purportedly hearing-impaired brings this action within the scope of the consent order and judgment entered by this Court in *Clarkson v. Coughlin*, 91 Civ. 1792(RWS) (the "Consent Decree"). *Clarkson* was commenced in this Court as a class action, brought on behalf of deaf and hard-of-hearing inmates in the custody of DOCS. In 1995 this Court granted summary judg-

ment awarding declaratory relief, *Clarkson v. Coughlin*, 898 F.Supp. 1019 (S.D.N.Y.1995), and on June 6, 1996, the Court approved the Consent Decree, which granted extensive relief on behalf of the class (the "Clarkson Class"). Given the nature of Arce's claims, on April 11, 2003 this Court entered a consent order in this action and the companion cases of *Figueroa v. Dean*, No. 99 Civ. 12457(RWS), and *Duquin v. Dean*, No. 99 Civ. 12458(RWS), consolidating discovery and indicating that all three actions would be prosecuted as motions for contempt of the Consent Decree.

On January 20, 2004, Defendants filed a motion for summary judgment on the ground that Arce had failed to exhaust his administrative remedies under the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). Arce filed opposition to the motion on March 11, 2004, and oral arguments were heard on April 21, 2004.

On October 26, 2004, Defendants were granted leave to file an additional motion for summary judgment as well as a supplemental brief on the issue of exhaustion under the PLRA. Both papers were submitted on February 14, 2005 and Plaintiff's opposition was filed on May 12, 2005. Defendants filed a reply in support of their second motion for summary judgment on May 26, 2005, and oral arguments were heard June 8, 2005, on which date both motions were marked fully submitted.

### Facts

The facts are taken from the record as well as both parties' Statements of Material Facts Pursuant to Local Civil Rule 56.1. The facts are not in dispute except as noted below.

Most relevant provisions of the Consent Decree are set forth in this Court's March 31, 2006 opinion in the companion case of *Figueroa v. Dean*, 425 F.Supp.2d 448

(S.D.N.Y.2006), familiarity with which is assumed.

At all times relevant to the complaint Arce was incarcerated at one of several DOCS facilities. Arce resided at Sullivan Correctional Facility ("Sullivan") from October 31, 2000 to June 15, 2001. He was then transferred to Fishkill Correctional Facility ("Fishkill"); transferred again to Downstate Correctional Facility ("Downstate") on or around June 19, 2001; and transferred to Midstate Correctional Facility ("Midstate") on or around June 26, 2001. On October 29, 2001, Arce was transferred to Wende Correctional Facility ("Wende"), where he resided until he was transferred to Eastern New York Correctional Facility ("Eastern") on April 13, 2004 for an extended assessment.

Each defendant was employed by DOCS at all times relevant to the complaint. James O'Connell ("O'Connell") was the acting Superintendent at Downstate, where Skip Hughes ("Hughes") was employed as the Inmate Grievance Supervisor. Corrections Officer Dwight Hunt ("Hunt") also worked at Downstate, and was assigned as a housing block officer in Unit 2–B. Joseph Costello ("Costello"), Roseann Mahoney ("Mahoney"), and David Napoli ("Napoli") were all employed at Midstate, as the Superintendent, Deputy Superintendent of Administrative Services, and Deputy Superintendent of Security, respectively. Edward Donnelly ("Donnelly") served as the Superintendent of Wende, where Martin Kearney ("Kearney") worked as a Corrections Captain.

Arce contends that he is a member of the inmate class protected by the Consent Decree, in that he is hard of hearing and has been discriminated against. The Consent Decree, which is to be interpreted consistent with the ADA and applicable federal regulations, defines a hard-of-hearing inmate as "a person incarcerated by [DOCS] who, because of a hearing impairment, is excluded from or unable to participate fully in activities, privileges or programs . . . which are available to all other New York state inmates." Consent Decree ¶ 1(c). DOCS Directive No. 2612 ("Directive 2612"), titled "Inmates with Sensorial Disabilities," defines hard of hearing (also described as "functional hearing impairment") as "a hearing loss of at least 40 dB in the better ear unaided, as measured by the Pure Tone Audiometry (PTA–500, 1000, and 2000 Hz) or Speech Recognition Threshold (SRT), or functional hearing communication difficulties with proper amplification as determined by an audiologist."

### Arce's Hearing Loss

Arce testified at deposition that when he was a teenager people often asked him, "can't you hear me?" He stated that at the time he did not believe he had a serious problem with his hearing. In 1965, Arce was drafted into the armed forces and underwent physical examinations. He testified that he was classified as 1–A, ready for service, although he claimed at deposition that he received the 1–A classification before the physical examinations, and did not recall whether his classification subsequently was changed.

Arce did not seek medical treatment for hearing loss until he was incarcerated. Indeed, although he was first incarcerated in 1974, the earliest DOCS record pertaining to Arce's hearing is a Chronological Entry Sheet from Sullivan, which contains an entry made by a corrections officer and dated November 20, 2000, stating, "Spoke to inmate in hall. Inmate claimed a hearing disability. No records on it." A DOCS Medical Problem List notes that on February 27, 2001, Arce was characterized as having a "severe hearing impairment." However, a chronological entry dated April 20, 2001 states that the writer had "re-

viewed with medical recommended accommodations—according to audiological consultation dated 12/12/00 and 1/22/01—with proper amplification he has functional hearing communication for daily listening needs at all facilities. . . . Inmate does not meet the criterion for functional hearing impaired under Directive 2612." The entry also appears to note that recommended accommodations included only hearing aids and preferred seating.

Arce has undergone repeated audiological exams to determine the extent of his purported hearing loss. The results have been highly inconsistent. Tests conducted in 2001 and 2002 found PTA thresholds ranging from 30 to 72 decibels in the left ear, and 48 to 63 decibels in the right ear. A March 11, 2002 entry in Wende health records remarked that Arce's inconsistent results indicated a "medical problem needing medical evaluation vs. invalid inmate response."

On April 13, 2004, Arce was transferred from Wende to Eastern for an extended assessment of his hearing loss. An initial consultation on May 25, 2004 found PTA thresholds of 67 decibels in the left ear and 63 decibels in the right ear, and recommended that Arce be provided with a range of accommodations including closed captioning, visual alarms, phone amplification and a shake awake alarm. However, after extended observation and repeated audiology consultations, it was determined that Arce "has a non-significant hearing loss" with PTA thresholds of 30 decibels in the left ear and 48 decibels in the right. The evaluation concluded that "Arce has functional hearing communication per daily listening needs at all facilities," and recommended only hearing aids and preferred seating as reasonable accommodations. This conclusion is consistent with DOCS records since 2001, which despite repeatedly characterizing Arce as having a

"severe hearing impairment" do not recommend the use of accommodations other than hearing aids and preferred seating.

On October 29, 2004, Arce was taken to Montefiore Medical Center for audiological testing by Defendants' expert, Robert J. Ruben, M.D. ("Dr.Ruben"), an otolaryngologist with approximately 40 years experience. Dr. Ruben reported "many inconsistencies" in the audiometric evaluation, particularly with respect to Arce's responses to the PTA evaluation. Dr. Ruben characterized these responses as "not reliable." In contrast, Dr. Ruben found that Arce's ability to discriminate between words—another aspect of the audiological examination—was consistently excellent, and was equivalent to that found in persons having PTA thresholds of 0–10 decibels. Dr. Ruben noted that Arce's responses to the testing are found typically in patients who, for one reason or another, are not acknowledging their threshold of hearing. He suggested that this type of response is indicative of malingering.

In sum, Dr. Ruben concluded that Arce has "no worse than a mild to moderate hearing loss, [and] may have normal hearing." Dr. Ruben believes, to a reasonable degree of medical certainty, that:

> Mr. Arce can function in any life setting without the assistance of hearing aids or any other assistive device as he has no functional hearing impairment. . . . [T]o the extent that he has any hearing loss, it is not of such magnitude that it would impede him from performing everyday activities, whether in an institutional setting or in the civilian world.

### Arce's Grievance History

As of early June 2001, Arce was housed in the Sensorially Disabled Unit ("SDU") at Sullivan. On June 15, 2001, he was transferred to Unit I at Fishkill, a unit that he claims had no accommodations for

hearing-impaired inmates. Arce, who uses a cane and knee braces as a result of knee and back problems, also believed that the unit was inappropriate for him because it had many stairs. Arce stated in his complaint that he submitted a grievance regarding the lack of accommodations at Fishkill, but DOCS has no record of any such grievance.

On or around June 19, 2001, Arce was transferred to Downstate. The following day, Arce filed two grievances. Grievance Number 8404–01 requested a full investigation as to why he had been transferred to Downstate and why there had been no response to the grievance he claimed to have filed at Fishkill on June 15, 2001. On June 22, the four-person Inmate Grievance Review Committee ("IGRC") responded that the reason for transfer was "separation from staff" and that Fishkill had no record of any grievance by Arce. Arce's appeals to Defendant Acting Superintendent O'Connell and the Central Office Review Committee ("CORC") were denied. Grievance Number 8405–01 alleged that Defendant Officer Hunt had been unable to provide Arce with closed-caption television, requested that the IGRC recommend Arce's transfer to "a facility for the handicapped," and that both Downstate and Fishkill be equipped with "closed caption TV, telephone amplifiers, visual smoke detectors, and other equipment, etc." The IGRC unanimously dismissed the grievance on June 22, 2001 because Arce had not "demonstrated need for accommodations," in addition to the fact that the grievance had been rendered moot by Arce's transfer to Midstate.

In 2001, Midstate was not equipped to house inmates with sensorial disabilities. If inmates with sensorial disabilities were transferred to Midstate, efforts were made to accommodate the inmate's needs until the inmate could be transferred to a more suitable facility. Arce testified at deposition that during his time at Midstate he had ten or fifteen conversations with Defendant Deputy Superintendent Mahoney regarding reasonable accommodations such as closed-caption decoders and telephone amplifiers, but that she did not take any action in response. Mahoney testified that she was familiar with Arce because he often complained that his hearing aids were broken, but she did not recall any verbal or written complaints from Arce regarding other accommodations for hearing-impaired inmates. DOCS telephone records show that Arce used the telephone frequently—sometimes several times a week—during the period he was housed at Midstate.

On August 17, 2001, while still at Midstate, Arce received a misbehavior report for delaying an inmate count. The misbehavior report stated that after the count had begun Arce left his cell to get his toast from the toaster, and responded disrespectfully when ordered repeatedly to return to his cell. Arce contended in his complaint that he had just emerged from the shower when the count began, and was not aware that a count was in progress because he did not have his hearing aids in. After a disciplinary hearing, Arce was found guilty of delaying the count, and received counseling and a five dollar fine. On August 22, 2001, Arce filed a grievance about the incident, requesting a transfer back to the Sullivan SDU, or alternatively that a "bell and yellow light" be installed in the cellblock to notify hearing-impaired inmates when a count was to begin. After review, the IGRC concluded that Arce's medical needs were being met, and that he did not qualify for transfer to a facility for the hearing-impaired. Arce subsequently requested an audiological exam and reiterated his request for transfer to Sullivan. The IGRC approved of the request for an audiological exam, but Arce was trans-

ferred to Wende before the assessment was conducted. Upon review, CORC advised Arce "to continue to address his medical concerns through sick call at his present facility."

On November 1, 2001 Arce requested reasonable accommodations through his counselor at Wende, John Cabrera ("Cabrera"). With the exception of hearing aids, which Arce already possessed, the requested accommodations were denied based on a determination that he did not meet the definition of hard of hearing under Directive 2612. On November 7, 2001, Arce filed a grievance requesting transfer to the Sullivan SDU. A transfer request was placed by Counselor Cabrera, but Arce was informed by Defendant Superintendent Donnelly that inmates "are not afforded the right to choose which facility they are transferred to." Ultimately, Arce's transfer request was denied, in part because it was determined that he did not require housing for the sensorially disabled, and in part due to other concerns, such as his mental health needs and his need for a flat facility. In reviewing the request, DOCS ADA Coordinator Donna Masterson noted that audiologists had not recommended any accommodations for Arce other than hearing aids.

On January 16, 2002, Arce wrote a letter to Superintendent Donnelly, complaining that Donnelly had not reviewed the denial of Arce's reasonable accommodations request. Sign language interpreter Ann Andzel ("Andzel"), who reviewed the denial of accommodations with Arce, stated in her affidavit that she did not pass on Arce's appeal because he refused to sign the necessary paperwork. At Donnelly's direction, Cabrera and Andzel met with Arce on January 23, 2002 to explain why the Superintendent had not reviewed the denial. The next day, Andzel and Deputy Superintendent Helen Dean met with Arce to reiterate that he did not meet the requirements of Directive 2612.

On January 14, 2002, Arce filed a grievance alleging that a fellow inmate who had purchased a new television had attempted to donate his old television to the SDU program at Wende, with Andzel's approval, but that Defendant Captain Kearney had wrongfully denied the request. In the grievance, Arce suggested that such donated televisions could be used by hearing-impaired inmates who could not afford to purchase their own televisions. The grievance was denied by IGRC and CORC on the basis that Wende Policy and Procedure Number 2310 and DOCS Directive Number 4921 both prohibited the donation of personal televisions unless the donating inmate was leaving the facility. Andzel stated in her affidavit that she had not approved Arce's request. She further stated that although Arce had hoped to borrow the donated television for his personal use, this would not have been permitted in any case because "he does not meet the definition of hard of hearing and his hearing loss is not severe enough to warrant closed captioning."

### Arce's Complaint Is Not Subject to the Exhaustion Requirements of the PLRA

■ Defendants' January 20, 2004 motion for summary judgment sought the dismissal of Arce's complaint in its entirety on the ground that Arce had failed to exhaust his administrative remedies as required by the PLRA. It is undisputed that claims under the ADA must be exhausted via the grievance procedure established under the PLRA. *Clarkson v. Coughlin,* No. 91 Civ. 1792(RWS), 2006 WL 587345, *2, 2006 U.S. Dist. LEXIS 9676, at *8 (March 6, 2006). However, the exhaustion requirement of the PLRA does not apply to actions that seek exclusively to enforce the Clarkson Consent Decree. *Id.*

In its April 11, 2003 order, this Court indicated that Arce's complaint would be prosecuted as a motion for contempt to enforce the Clarkson Consent decree. Arce has repeatedly confirmed that his complaint is properly treated as a motion for contempt of the Consent Decree. *See, e.g.,* Pl.'s Mem. Opp'n Summ. J., at 5 (Mar. 12, 2004). Since the action seeks exclusively to enforce the Clarkson Consent Decree, it is not subject to the exhaustion requirements of the PLRA, and Defendants' motion for summary judgment on that ground is hereby denied.

### Standard for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Communications, Inc. v. Herrick Co.,* 360 F.3d 329, 338 (2d Cir.2004). The moving party has the initial burden of showing that there are no material facts in dispute, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case, *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir.1985). However, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### Arce Lacks Standing to Enforce the Consent Decree

"Whether a claimant has standing is 'the threshold question in every federal case, determining the power of the court to entertain the suit.'" *In re Gucci,* 126 F.3d 380, 387–88 (2d Cir.1997) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). A plaintiff who is not a party to or a member of the class protected by a consent decree has no standing to bring a motion for contempt alleging violations of the decree. *Pollard v. City of Hartford,* 539 F.Supp. 1156, 1162 (D.Conn.1982); *see also Reynolds v. Butts,* 312 F.3d 1247, 1249 (11th Cir.2002) (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). In responding to a motion for summary judgment, the party invoking federal jurisdiction must establish standing by setting forth specific evidence sufficient to raise a genuine issue of material fact. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

The class protected by the Consent Decree consists of two subclasses, the first of which comprises "all present and future deaf and hearing-impaired male inmates of the New York State Department of Correctional Services who have been, are, or will be discriminated against, solely on the basis of their disability, in receiving the rights and privileges accorded to all other inmates." Consent Decree at 2 (quoting *Clarkson v. Coughlin,* 145 F.R.D. 339 (S.D.N.Y.1993)). The Consent Decree de-

fines a deaf or hard-of-hearing inmate [1] as "a person incarcerated by [DOCS] who, because of a hearing impairment, is excluded from or unable to participate fully in activities, privileges, or programs of [DOCS] ... which are available to all other New York state inmates." *Id.* ¶ 1(c).

As the movants for summary judgment, Defendants have carried their initial burden of demonstrating an absence of genuine dispute regarding Arce's membership in the class protected by the Consent Decree. Specifically, Defendants have demonstrated that, to the extent Arce suffers from hearing loss, it is not such as would prevent him from participating fully in "activities, privileges, or programs of [DOCS]." After examining Arce, Dr. Ruben concluded that he "can function in any life setting without the assistance of hearing aids or any other assistive device as he has no functional hearing impairment.... To the extent that he has any hearing loss, it is not of such magnitude that it would impede him from performing everyday activities ...." This conclusion is buttressed by the findings of prior audiological examinations. After an extended assessment, medical personnel at Eastern determined that Arce "has a non-significant hearing loss" and "functional hearing communication per daily listening needs at all facilities." Tests conducted in 2000 and 2001 also indicated that "with proper amplification [Arce] has functional hearing communication for daily listening needs." Although some of Arce's medical records do characterize him as having a "severe hearing impairment," that description is belied by the fact that examiners consistently found that Arce did not require any assistive devices other than hearing aids.

In response, Arce has not presented specific facts sufficient to give rise to a genuine issue of material fact. There is no evidence that Arce has ever had difficulty participating in DOCS educational or vocational programming on account of hearing loss. He has not alleged that hearing loss caused him to be excluded from or disadvantaged during grievance and disciplinary proceedings or medical, dental, and counseling appointments. Arce has alleged that while at Midstate he experienced difficulty using the telephone, but the record shows that during that time he was a frequent telephone user, often making calls up to half an hour long.

Arce relies heavily on the fact that on several occasions he was tested as having PTA thresholds above forty decibels in both ears. This measurement of hearing loss qualifies him as "hard of hearing" within the meaning of DOCS Directive 2612. As previously noted, Arce's PTA threshold measurements were highly inconsistent, and his responses to the PTA test were described by Dr. Ruben as "unreliable." Nevertheless, Arce contends that because at least some of the PTA threshold measurements qualified him as "hard of hearing" under Directive 2612 there is a genuine dispute regarding his membership in the class covered by the consent decree.

Arce further argues that he is a member of the class because Directive 2612, reflecting the language of the ADA, protects not only individuals who are actually hard of hearing, but also those who are "regarded as" hard of hearing. Arce contends that the evidence, including DOCS records de-

---

1. Although the class is described as comprising certain "deaf and *hearing-impaired*" inmates, the Consent Decree defines and uses exclusively the phrase "deaf and *hard* of *hearing* inmates." Since no independent definition for "hearing-impaired" is given and the phrases appear to be interchangeable, "hearing-impaired" and "hard of hearing" shall be construed to be synonymous.

scribing him as having a "severe hearing impairment," shows that Defendants regarded him as hard of hearing.

"[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). A court may not "expand or contract the agreement of the parties as set forth in the consent decree, and the explicit language of the decree is given great weight." *Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985). In describing the protected class, the Consent Decree provides a clear definition for the term "hard-of-hearing inmate." In determining the extent of DOCS' obligations under the Consent Decree, the Court is mindful of its responsibility not to expand the agreement of the parties, and will not import standards from external sources to supplement the explicit language of the Consent Decree itself. Because Arce has not demonstrated a genuine issue of material fact regarding his membership in the class protected by the Consent Decree, he has not established that he has standing to bring a motion for contempt.

### Conclusion

For the foregoing reasons, Defendants' January 20, 2004 motion for summary judgment on the ground of exhaustion is denied; Defendants' October 26, 2004 motion for summary judgment is granted; and Arce's complaint is dismissed in its entirety.

It is so ordered.