Stephen D. ALSTER, Plaintiff,

v.

Glenn S. GOORD, et al., Defendants.

No. 05 Civ. 10883(WHP).

United States District Court,
S.D. New York.

Sept. 10, 2010.

Stephen D. Alster, Romulus, NY, pro se.

Thomas M. Biesty, Esq., Office of the Attorney General, New York, NY, for State Defendants.

Janice Casey Silverberg, Esq., Office of the Corporation Counsel, New York City Law Department, Bronx, NY, for Municipal Defendants.

### MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge.

Plaintiff *pro se* Stephen D. Alster ("Alster") brings this federal civil rights action pursuant to 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.*, against the State of New York (the "State"), the New York State Department of Correctional Services ("NYSDOCS"), various named and unnamed NYSDOCS officials and employees (collectively the "State Defendants"), the City of New York (the "City"), the New York City Department of Correction ("NYCDOC"), Prison Health Services, Inc. ("PHS"), various named and unnamed NYCDOC officials and PHS employees, and OTO Health (collectively the "Municipal Defendants"). By Memorandum and Order dated February 26, 2008, this Court dismissed Alster's § 1983 claims against the State, NYS-DOCS, former NYSDOCS Commissioner Glen S. Goord, Inmate Grievance Director Thomas Eagen, Superintendent Robert Ercole, Deputy Superintendent Robert Cunningham, Program Director James Temple ("Temple"), and Counselor Luis Gonzalez, but preserved the ADA claims against them to the extent they are sued in their official capacities. *Alster v. Goord,* No. 05 Civ. 10883(WHP), 2008 WL 506406 (S.D.N.Y. Feb. 26, 2008). Having completed discovery, the State and Municipal Defendants move for summary judgment on all remaining claims. For the following reasons, the State Defendants' motion is granted in part and denied in part, and the Municipal Defendants' motion is granted.

### BACKGROUND

Alster brings a variety of constitutional and statutory claims, most trivial but some serious, which this Court endeavors to untangle below. Since July 2002, he has been incarcerated in State and City facilities serving a sentence of twenty years to life. (State Defendants' Statement of Material Facts Pursuant to Local Rule 56.1 ("NYS Defs. 56.1 Stmt.") ¶ 2.)

### I. State Custody: July 2002—November 2003

On July 17, 2002, Alster entered Green Haven Correctional Facility ("Green Haven") in a wheelchair. Green Haven is designed to accommodate inmates with wheelchairs. (Declaration of Thomas M. Biesty dated Sept. 27, 2009 Ex. 1: Deposition of Stephen Alster dated Feb. 13, 2007 ("Alster Dep.") at 28–30; Declaration of Carl J. Koenigsmann dated Sept. 22, 2009 ("Koenigsmann Decl.") ¶ 5; Declaration of Jeff Richards dated Sept. 25, 2009 ¶ 3.)

### A. Neurological Condition & Accommodations

In 1998, before his incarceration, Alster was diagnosed by Dr. Martin Gizzi ("Dr. Gizzi"), a neurologist, with cerebellar ataxia—a neurological condition that impairs motor control and limits the ability to walk. (Plaintiff's Counter Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl. NYS 56.1 Stmt.") Ex. 2: Letter from Dr. Gizzi dated Apr. 30, 1999 ("Gizzi Letter") at 1–2.) Dr. Gizzi opined that "no medication or surgical treatment" would

"improve his condition," which along with "its attendant disability are permanent and will likely worsen as it is complicated by the effects of aging." (Gizzi Letter at 2.)

At Green Haven, Alster was housed initially in the infirmary and examined by a physiatrist—a physician specializing in physical medicine and rehabilitation. (Koenigsmann Decl. ¶ 5.) The physiatrist concluded Alster could independently engage in "activities of daily living." (Koenigsmann Decl. Ex. 1: Interdepartmental Communication from Dr. Carl J. Koenigsmann dated Sept. 5, 2002 ("Koenigsmann Memo").) At the physiatrist's recommendation, Alster was assigned to a single-occupancy cell in general population housing on a level accessible without stairs and provided a wheelchair for use outside his cell. (NYS Defs. 56.1 Stmt. ¶ 5.) The parties dispute whether Alster received a cane for use inside his cell. (NYS Defs. 56.1 Stmt. ¶ 5; Pl. NYS 56.1 Stmt. ¶ 5.)

On August 28, 2002, Alster wrote to Green Haven's superintendent objecting to his placement in general population. (Koenigsmann Decl. Ex. 1: Letter from Stephen Alster dated Aug. 28, 2002.) Dr. Carl Koenigsmann ("Dr. Koenigsmann"), Green Haven's Facility Health Services Director, responded that his accommodations were appropriate pending a neurological evaluation. (Koenigsmann Decl. Ex. 1: Letter from Dr. Koenigsmann dated Sept. 5, 2002.) In September 2002, Alster again requested a housing change because neither his cell nor the showers were wheelchair accessible. (Pl. NYS 56.1 Stmt. ¶ 5; Koenigsmann Decl. Ex 1: Ambulatory Health Record dated Sept. 12, 2002.) On September 18, 2002, Alster's attorney forwarded Alster's medical records to Dr. Koenigsmann, noted that Alster had fallen multiple times and was "limited in his use of both shower and toilet facilities," and explained Alster's diagnosis. (Pl. NYS 56.1 Stmt. Ex. 2: Let-

ter from Robert A. Solomon dated Sept. 18, 2002.) By letter dated October 7, 2002, Alster's attorney informed Dr. Koenigsmann that Alster had fallen five times and had not been able to shower since his arrival. He demanded a wheelchair-accessible cell with grab bars and a wheelchair-accessible shower. (Pl. NYS 56.1 Stmt. Ex. 2: Letter from Robert A. Solomon dated Oct. 7, 2002.)

Alster was examined by a neurologist on September 23 and October 21, 2002. (Koenigsmann Decl. ¶¶ 6–7.) The neurologist determined that an "MRI brain [scan] though ideal would be difficult because his [dental] implants need to be removed. Thus, CT head contrast is recommended [to] compare [with the] prior study." (Koenigsmann Decl. Ex. 1: Request & Report of Consultation dated Oct. 21, 2002.) When the CT scan showed no abnormalities, the neurologist told Alster his pre-incarceration diagnosis was placed "into doubt." (Koenigsmann Decl. ¶¶ 8–9.) Alster contends Green Haven refused to order an MRI—which, according to Alster, is necessary to detect his condition—because his dental implants would need to be removed and replaced. (Pl. NYS 56.1 Stmt. ¶ 7.)

On August 27, 2003, Alster was referred back to the physiatrist after complaining that he was having difficulty walking and his balance was "worsening." (Koenigsmann Decl. Ex. 1: Ambulatory Health Record dated Aug. 27, 2003 & Request & Report of Consultation dated Oct. 8, 2003 ("Oct. 8, 2003 R & R").) NYSDOCS records state that Alster used a wheelchair "for mobility" but was "able to stand [and] transfer" with assistance. (Oct. 8, 2003 R & R.) At the physiatrist's recommendation, a neurologist examined Alster again on October 27, 2003 and reviewed his records. (Koenigsmann Decl. ¶ 10; Oct. 8, 2003 R & R.) The neurologist noted Alster com-

plained of "falling a lot" and reported Alster could get up from his wheelchair by "holding me [and the] countertop." (Oct. 8, 2003 R & R.) He concluded that Alster's neurological condition "[did] not support typical cerebellar syndrome" and that no further evaluations were necessary. (Koenigsmann Decl. ¶ 10; Oct. 8, 2003 R & R.)

Dr. Koenigsmann avers that Alster was "functional" in general population housing, that his accommodations were "medically appropriate," and that he had "no documented falls or injuries resulting from any falls." (Koenigsmann Decl. ¶ 12.)

### B. *Dental Care*

Alster requires upper dentures and has dental implants in his lower jaw. (Declaration of Janice Silverberg dated Sept. 23, 2009 ("Silverberg Decl.") Ex. K: Alster Dep. at 20–22.) Alster arrived at Green Haven missing his lower overdenture. (Koenigsmann Memo.) On July 19, 2002, Alster was seen by Dr. Eduardo Licerio ("Dr. Licerio"), Green Haven's Dental Director. (NYS Defs. 56.1 Stmt. ¶ 17.) Dr. Licerio made a full set of dentures, which Alster refused because they "did not fit [ ]or feel right." (Pl. NYS 56.1 Stmt. ¶ 18.) Alster demanded implant dentures, but NYSDOCS policy does not cover them. (Declaration of Eduardo Licerio dated Sept. 14, 2009 ¶ 4.)

In October 2002, Regional Dental Director Dr. William Stolfi ("Dr. Stolfi") assumed Alster's dental care. (NYS Defs. 56.1 Stmt. ¶ 19.) That month, Dr. Stolfi ordered another upper denture and lower overdenture. (Declaration of William Stolfi dated Sept. 24, 2009 ("Stolfi Decl.") Ex. A: Receipt at DEFS 0661.) Alster refused them claiming they did not fit and the lower denture did not attach to his implant bar. (Plaintiff's Declaration dated Nov. 13, 2009 ¶ 3.) Dental records show Dr. Stolfi asked Alster for the type of attachment needed for his implants, which

Alster never provided. (Stolfi Decl. Ex A: Dental Treatment Record at DEFS 0665.) Alster failed to appear for a December 2002 appointment. Then, in January 2003, he refused to allow Dr. Stolfi to check the dentures' fit, and later that month refused the dentures again. (NYS Defs. 56.1 Stmt. ¶¶ 20–22.) Alster was then informed that any further dental care would be at his request. (NYS Defs. 56.1 Stmt. ¶ 23.) There is no evidence Alster requested or received dental care in State custody after January 2003. (Pl. NYS 56.1 Stmt. ¶¶ 17, 20, 22.)

### II. *City Custody: November 2003—July 2005*

#### A. *Neurological Care & Accommodations*

On November 4, 2003, Alster was transferred to City custody at Rikers Island ("Rikers") and placed in the North Infirmary Command (the "NIC"), Dormitory 3 ("Dorm 3"). (Municipal Defendants' Rule 56.1 Statement of Material Facts Not in Dispute ("NYC Defs. 56.1 Stmt.") ¶¶ 2, 5.) Dorm 3 houses inmates with physical handicaps and features accommodations including wheelchair-accessible showers. (Declaration of Jerome Davis dated Sept. 24, 2009 ("Davis Decl.") ¶ 4.) Alster claims his dormitory had no grab bars and insufficient space between beds, but does not allege he was injured as a result. (Plaintiff's Counter Statement of Material Facts Pursuant to Rule 56.1 ("Pl. NYC 56.1 Stmt.") ¶ 5.) Dorm 3 inmates are assisted with activities of daily living by other inmates. (Davis Decl. ¶ 5.) The NIC is staffed with medical professionals, and a nurse visits Dorm 3 daily. (Davis Decl. ¶ 6.)

Dorm 3 has a television in the common area. (Davis Decl. ¶ 16.) While Alster claims he could not access the common area in his wheelchair, he also asserts he

could not hear the television over the room's noise. Alster claims his Kosher meals were sometimes forgotten, "improperly handled," "often the same for many days," and not provided in the clinic. (Pl. NYC 56.1 Stmt. ¶¶ 6–7.) Alster testified that although he complained to Captain Juana Maria ("Maria") about his food, "nothing ever happened." (Alster Dep. at 120.)

Rikers issued Alster a wheelchair upon his arrival. (Parks Decl. ¶ 4.) When Alster complained about it, Rikers issued him a new one in September 2004, which he concedes was "much better." (NYC Defs. 56.1 Stmt. ¶ 16; Pl. NYC 56.1 Stmt. ¶ 16.) However, Alster claims that in accord with Rikers's standard practice, prison officials "removed all [ ] removable parts" from each wheelchair "such as sides, leg rests, cushions and arm rests" because "they were considered by [NYC]DOC to be weapons." (Pl. NYC 56.1 Stmt. ¶ 16.) Alster contends the wheelchair was uncomfortable. (Pl. NYC 56.1 Stmt. ¶¶ 16–17.) On June 13, 2005, Rikers issued Alster another new wheelchair, but he refused it. (NYC Defs. 56.1 Stmt. ¶ 17.)

## B. *General Medical Care*

Rikers inmates receive medical care from PHS under a city contract. (NYC Defs. 56.1 Stmt. ¶ 3.) Alster was seen at sick call on 119 occasions or "about 1 visit per week," and Rikers ordered him twenty-four specialist consultations. (Pl. NYC 56.1 Stmt. ¶ 9; Declaration of Trevor Parks, M.D. dated Sept. 23, 2009 ("Parks Decl.") ¶¶ 5–7.) Alster's only major issue arose in November 2003—when Alster complained for two days of abdominal pain, Rikers took him to the hospital, where he had gall bladder surgery. (NYC Defs. 56.1 Stmt. ¶¶ 10, 29.) PHS Regional Medical Director Dr. Trevor Parks ("Dr. Parks") states Alster refused treatment more than twenty times. (Parks Decl. ¶¶ 1, 9.) Alster responds that more than

once he was not transported to appointments. He specifically claims that Officer Neville Bonito ("Officer Bonito") refused to transport him to one consultation. (Pl. NYC 56.1 Stmt. ¶¶ 12, 19.)

## C. *Hearing Care*

Alster received hearing aids in January 2005. (NYC Defs. 56.1 Stmt. ¶ 19.) He claims there were delays in receiving new batteries because they were distributed every two weeks at sick call and not on demand. (Pl. NYC 56.1 Stmt. ¶ 19.) Alster also claims the hearing aids, which were manufactured by OTO Health, were uncomfortable, lacked features to which he was accustomed, and could not "compensate for [his] hearing loss under varying conditions." (Pl. NYC 56.1 Stmt., ¶ 21; Silverberg Decl. Ex. I: Amended Complaint dated Dec. 1, 2006 ("Compl.") ¶ 40.)

Dr. Parks states that Norene Thomas ("Thomas"), the Nursing Director, instructed Alster on using his hearing aids, although Alster complains her instructions were inadequate. (NYC 56.1 Stmt. ¶ 20.) NIC Deputy Warden Jerome Davis ("Davis") avers Alster met with a disability coordinator about using his hearing aids. (Affirmation of Jerome Davis in Opposition to Order to Show Cause dated June 15, 2005 ("Davis OTSC Aff.") ¶¶ 11.) Alster regularly wore his hearing aids and admits he "was able in most instances to communicate successfully" on the prison telephones, some of which had amplifiers. (Pl. NYC 56.1 Stmt. ¶ 21.)

## D. *Dental Care*

In October 2004, Alster was examined by PHS dentist Dr. Andrew Koukoulas ("Dr. Koukoulas"), who took impressions of his upper jaw and ordered an upper denture. (Pl. NYC 56.1 Stmt. ¶ 24; Declaration of Andrew Koukoulas, D.M.D. dated Sept. 9, 2009 ("Koukoulas Decl.") ¶¶ 1, 5–6,

8.) Dr. Koukoulas informed Alster he needed authorization to replace the lower overdenture. (Koukoulas Decl. ¶¶ 10–11.) Alster asserts that PHS dentist Dr. Eva Watkis ("Dr. Watkis"), who assumed his care in 2005, said the dentures he needed were "too expensive" and that she did not know how to make them. (Compl. ¶ 39; Koukoulas Decl. ¶ 12.) Although PHS does not perform fixed dental restoration at Rikers, Dr. Watkis obtained approval for Alster's oral surgery and scheduled it for May 20, 2005. (Koukoulas Decl. ¶ 11; Affidavit of Dr. Eva Watkis dated June 15, 2005 ("Watkis Aff.") ¶ 3.) This appointment was cancelled because it conflicted with a court date. (Watkis Aff. ¶ 3.)

Alster claims his upper denture was delayed due to "record mismanagement," but concedes the dentist said it took three months to manufacture a denture and that during that interval Dr. Koukoulas tested its fit and the laboratory made adjustments. (Pl. NYC 56.1 Stmt. ¶¶ 12, 23; Koukoulas Decl. ¶¶ 5, 8.) When the upper denture was delivered, Alster refused it as uncomfortable. (NYC Defs. 56.1 Stmt. ¶ 24.) Dr. Koukoulas ordered a second denture, permitting Alster to keep the first one in the interim. (Koukoulas Decl. ¶ 9.) Alster asserts he could not properly chew food with his upper denture. (Pl. NYC 56.1 Stmt. ¶ 23.) Davis and Thomas aver that Alster never complained about difficulties eating and did not noticeably lose weight. (Davis OTSC Aff. ¶ 17; Affidavit of Norene Thomas in Opposition to Order to Show Cause dated June 15, 2005 ¶ 6.)

### E. *Injuries During Transport*

Alster asserts that he experienced discomfort and frequently fell during transport because Rikers's vehicles were poorly equipped and its personnel inadequately trained. (Compl. ¶¶ 56–57; Pl. NYC 56.1 Stmt. ¶¶ 28–29.) One "Injury to Inmate" report records that in March 2004, Alster sustained superficial scratches while exiting a transport van. (NYC Defs. 56.1 Stmt. ¶ 28.) NYCDOC records further show that on June 4, 2004, Alster complained that his arm was injured when his wheelchair tipped over during transport. (NYC Defs. 56.1 Stmt. ¶ 28.) Alster was taken to urgent care, where x-rays showed no fractures or dislocation. (NYC Defs. 56.1 Stmt. ¶ 28.) Alster claims he was injured during transport "several times," but does not recall the nature of those injuries. (Compl. ¶¶ 60, 84; Alster Dep. at 129.)

### F. *Security Procedures & Interactions with Prison Staff*

NYCDOC security procedures required that inmates be transported between facilities by a Corrections Officer. (NYC Defs. 56.1 Stmt. ¶ 32.) At Rikers, Alster "routinely visited locations on and off island, including the law library, physical therapy, religious services, and medical clinic appointments, either by wheeling himself or being wheeled by a Correction[s] Officer." (Davis Decl. ¶ 11.) Alster testified that Maria once refused to transport him to a religious service because he was not wearing the required jumpsuit. (Alster Dep. at 119.) He also claims an unidentified officer refused to take him to a religious service. (Alster Dep. at 125–26.) Davis investigated and determined Alster was not ready when the officer arrived. (NYC Defs. 56.1 Stmt. ¶ 32.) Corrections Officers are not permitted to adjust their transport schedules. (NYC Defs. 56.1 Stmt. ¶ 32.)

Alster claims that Officer Bonito, who transported inmates, kicked him twice. Alster further testified that Officer Bonito frequently kicked his wheelchair and that the two swore at each other and used racial epithets. (Alster Dep. at 116.)

Security procedures require inmates to wear jumpsuits for attorney visits and oth-

er appointments. (NYC Defs. 56.1 Stmt. ¶ 33.) Dorm 3 inmates were assisted by other inmates with dressing. (Davis Decl. ¶ 15.) Alster does not dispute that he frequently saw his attorney. (*See* Pl. NYC 56.1 Stmt. ¶ 33.) On one occasion, Davis observed Alster visiting his attorney without the jumpsuit. (Davis Decl. ¶ 15.) At Davis's instruction, Captain Desiree Lockhart ("Lockhart") immediately terminated the visit. (Davis Decl. ¶ 15; Pl. NYC 56.1 Stmt. ¶ 33.) Alster alleges another attorney visit was interrupted in October 2004. (Compl. ¶ 49.)

III. *State Custody: July 2005—July 2008*

A. *Neurological Condition & Accommodations*

On July 7, 2005, Alster was transferred back to Green Haven. (NYS Defs. 56.1 Stmt. ¶ 10.) He was again housed on the first floor and given a wheelchair for use outside his cell. (Declaration of Harry Mamis, M.D. dated Sept. 23, 2009 ("Mamis Decl.") ¶ 10; Declaration of Dr. Frederick Bernstein dated Sept. 23, 2009 ("Bernstein Decl.") ¶ 13.) Alster was assigned to Dr. Harry Mamis ("Dr. Mamis") for primary care. (Mamis Decl. ¶¶ 2–3.)

In July 2005, Alster wrote several letters requesting placement in the Unit for the Physically Disabled, which houses inmates who need assistance or accommodations to engage in activities of daily living. (Bernstein Decl. ¶¶ 5–6, 9.) On July 29, 2005, Dr. Frederick Bernstein ("Dr. Bernstein"), the new Facility Health Services Director, informed Alster that his condition did not warrant placement in the Unit for the Physically Disabled. (Bernstein Decl. ¶¶ 9–10.)

In August and September 2005, Alster again requested placement in the Unit for the Physically Disabled. (NYS Defs. 56.1 Stmt. ¶ 15.) He stated he was unable to shower, and his attorney wrote demanding a wheelchair-accessible cell and shower. (Pl. NYS 56.1 Stmt. ¶¶ 11–12; Bernstein Decl. Ex. 3: Memorandum from Dr. Frederick Bernstein dated Sept. 19, 2005 ("Bernstein Memo").) When asked to verify Alster's claims, Dr. Mamis reviewed Alster's medical records and reported he "had no 'verifiable disability' that would necessitate a move." (Mamis Decl. ¶¶ 10–11.) Dr. Bernstein again denied Alster's request. (Bernstein Memo.)

On August 30, 2006, prison staff referred Alster to a neurologist, noting that he was "more-or-less confined to a wheelchair primarily due to 'ataxia' vertigo." (Bernstein Decl. Ex. 4: NYSDOCS Request & Report of Consultation, Referral dated Aug. 30, 2006.) The neurologist could not determine whether Alster was a "malingerer" and recommended another CT scan. (Bernstein Decl. ¶ 12.) The record does not reveal whether the CT scan was conducted.

B. *Primary Care Provided by Dr. Mamis*

While serving as Alster's primary care physician, Dr. Mamis referred Alster to no fewer than twelve specialist appointments. (NYS Defs. 56.1 Stmt. ¶¶ 33–35.) When Alster complained of back pain in early 2006, Dr. Mamis ordered an x-ray and physical therapy, and prescribed pain medication. (NYS Defs. 56.1 Stmt. ¶¶ 40–41; Mamis Decl. ¶ 14.) Dr. Mamis deviated twice from other providers' prescriptions based on his examination of Alster or the availability of medications at the pharmacy. (NYS Defs. 56.1 Stmt. ¶¶ 43–44.)

C. *Hearing Care*

On July 15, 2005, Alster was examined by John Serhan ("Serhan"), an audiologist. (Declaration of John A. Serhan dated Sept. 28, 2009 ("Serhan Decl.") ¶ 3.) In August 2005, Serhan gave Alster a hearing test to

assess his functionality at Green Haven. (Serhan Decl. ¶¶ 3–4.) Although Serhan's preliminary evaluation was that Alster had significant hearing impairment, he questioned the test's results when Alster claimed that his state-of-the-art hearing aids did not work and that he intended to obtain a transfer because of his hearing problems. (Serhan Decl. ¶ 4.) In October 2005, Serhan gave Alster a set of trial hearing aids. (Serhan Decl. ¶ 5.) Serhan avers that at his next appointment, Alster said he could not function at Green Haven without implant hearing aids, which are not covered by NYSDOCS policy. (NYS Defs. 56.1 Stmt. ¶ 26.) According to Serhan, Alster said he would refuse all hearing aids in an effort to obtain a transfer. (NYS Defs. 56.1 Stmt. ¶ 26.)

On January 20, 2006, Serhan performed another hearing test and determined Alster deliberately performed poorly. (Serhan Decl. ¶ 7.) When Alster complained about his hearing aids, Serhan sent one for repair and cleaned the other. (Serhan Decl. ¶ 7.) When Serhan returned the hearing aids in March 2006, Alster claimed they were uncomfortable. (NYS Defs. 56.1 Stmt. ¶ 28.) Serhan avers that at his April 2006 consultation, Alster refused a hearing test, complained his hearing aids were inadequate, and returned them. (Serhan Decl. ¶ 10.) Because Serhan believed Alster was trying to "manipulate the system by feigning near complete deafness," he decided Alster would be seen on a yearly basis from then on. (Serhan Decl. ¶ 10.)

Over the next year and a half, Serhan examined Alster three times and provided another pair of hearing aids. (Serhan Decl. ¶¶ 12–14.) In May 2008, Serhan performed a hearing test he deemed reliable, and determined Alster had significant hearing impairment. (NYS Defs. 56.1 Stmt. ¶ 31.) As a result, Serhan recommended a transfer. In July 2008, Alster was transferred from Green Haven to Five Points Correctional Facility. (NYS Defs. 56.1 Stmt. ¶ 31.)

## DISCUSSION

### I. Legal Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. If the moving party meets its burden to "show that no genuine factual dispute exists." *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004), the non-moving party must then set forth "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e). The Court resolves all factual ambiguities and draws all inferences in the non-moving party's favor. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505.

The same standards apply to a pro se litigant, but "such a litigant is given special latitude in responding to a summary judgment motion." *Pabon v. Wright,* No. 99 Civ. 2196(WHP), 2004 WL 628784, at *4 (S.D.N.Y. Mar. 29, 2004); *see also Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir. 1988). Courts must "liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." *Bertin v. United States,* 478 F.3d 489, 491 (2d Cir.2007).

## II. *Failure to Effect Service*

By Order dated June 9, 2009, this Court directed Alster to effect service on all named individual Defendants by July 31, 2009. Nonetheless, Alster has not served Municipal Defendants Norene Thomas or Captain Desiree Dupree. Accordingly, this Court dismisses the claims against them pursuant to Fed.R.Civ.P. 4(m).

## III. *Injunctive Relief*

■ In his Amended Complaint, Alster seeks injunctive relief barring retaliation and requiring proper medical care. However, Alster's claims are premised on conditions he experienced while at Green Haven and Rikers. Since bringing this action, Alster has been transferred to another facility. "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir. 1996). Accordingly, Alster's claims for injunctive relief are moot.

## IV. *Exhaustion of Administrative Remedies*

■ The Prison Litigation Reform Act of 1995 ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

■ The PLRA exhaustion requirement is not jurisdictional, and "failure to exhaust is an affirmative defense under the PLRA." *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). "Failure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case." *United States for & on Behalf of Mar. Admin. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago,* 889 F.2d 1248, 1253 (2d Cir.1989); *see* Fed.R.Civ.P. 8(c); *Johnson v. Testman,* 380 F.3d 691, 695–96 (2d Cir. 2004). Because the Municipal Defendants did not plead non-exhaustion in their answers, and raise it only now following the close of discovery, their motion for summary judgment for failure to exhaust is denied.

■ The State Defendants contend Alster failed to exhaust his ADA claim that Temple denied him a job program placement because of his disability. "[C]laims under the ADA must be exhausted via the grievance procedure established under the PLRA" before an inmate-plaintiff may pursue remedies in federal court. *Arce v. O'Connell,* 427 F.Supp.2d 435, 440 (S.D.N.Y.2006); *see Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *abrogated in part on other grounds by Porter,* 534 U.S. at 516, 122 S.Ct. 983. Alster filed three grievances claiming denial of a program in 2007—long after he filed his Complaint on December 30, 2005. (*See* Declaration of Rebecca Loren dated Sept. 25, 2009 ¶ 3.) Although Alster asserts in his opposition that he filed a program-related grievance in June 2003, any such grievance is irrelevant because the Amended Complaint alleges that Temple violated the ADA beginning in 2005. Moreover, to the extent Alster now challenges conduct in 2003, a *pro se* plaintiff "cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment." *Auguste v. Dep't of Corr.,* 424 F.Supp.2d 363, 368 (D.Conn.2006). Accordingly, because no ground for excusing

the exhaustion requirement applies, *see Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006), summary judgment is granted on Alster's ADA claim for denial of a program.

## V. *Eighth Amendment Claims*

### A. *Inadequate Medical Care*

■ "[T]o establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to his serious medical needs.'" *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). "The standard of deliberate indifference includes both subjective and objective components." *Chance,* 143 F.3d at 702 (internal quotations omitted).

■ "First, the alleged deprivation must be, in objective terms, sufficiently serious," a standard which "contemplates a condition of urgency, one that may produce death, degeneration or extreme pain." *Chance,* 143 F.3d at 702; *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). However, an inmate need not show that he "experiences pain that is at the limit of human ability to bear, [or] that [his] condition will degenerate into a life-threatening one." *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003).

■ "Second, the defendant must act with a sufficiently culpable state of mind." *Chance,* 143 F.3d at 702. The prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[T]hat a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth

Amendment." *Estelle,* 429 U.S. at 106, 97 S.Ct. 285.

### 1. *Neurological Care*

■ Alster claims Dr. Koenigsmann and other State Defendants refused to order an MRI to assess whether he suffered from cerebellar ataxia. "Whether an MRI should have been done is a classic example of a matter for medical judgment as to the appropriate course of treatment and is not actionable under the Eighth Amendment." *Joyner v. Greiner,* 195 F.Supp.2d 500, 505 (S.D.N.Y.2002). Here, a neurologist recognized that an MRI could not be performed because Alster had dental implants, so a CT scan was performed instead. This decision was not deliberately indifferent to Alster's medical needs but, rather, required by them. *See Gonzalez v. Coughlin,* Nos. 94 Civ. 1119, 97 Civ. 320(LES), 2008 WL 2385948, at *8 (N.D.N.Y. June 9, 2008) (no violation where prison performed CT scan instead of recommended MRI because inmate had pellets in his head). Accordingly, the Court grants summary judgment dismissing this claim.

### 2. *Dental Care*

■ Alster claims Drs. Licerio, Stolfi, Koukoulas and Watkis failed to provide (1) a usable upper denture, and (2) a lower overdenture that would affix to his implants. Defendants concede an inmate's lack of teeth or dentures is a serious medical need under the Eighth Amendment.

Prisoners are not entitled to a "perfect plan for dental care." *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Nonetheless, the unrefuted evidence shows that State Defendants Drs. Licerio and Stolfi provided Alster an upper denture and lower overdenture. They could not fully address Alster's needs because he refused to allow them to fit the prosthetics and did

not provide the necessary dental information to enable a good fit. Moreover, after January 2003, Alster never requested dental care from the State. Such evidence of a prisoner's refusal of care "effectively rebut[s] claims of deliberate indifference to serious medical needs." *Rivera v. Goord*, 253 F.Supp.2d 735, 756 (S.D.N.Y.2003).

With respect to the Municipal Defendants, "delay in providing a prisoner with dental treatment, standing alone, does not constitute an [E]ighth [A]mendment violation." *Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir.1989). Rather, a prisoner must show "the delay was deliberate and that it caused [him] to suffer unnecessary and wanton infliction of pain." *Hunt*, 865 F.2d at 201. Alster concedes he was informed it took three months to manufacture a denture, during which time Dr. Koukoulas made adjustments to fit Alster's needs. Moreover, the seven-month delay before the scheduled surgery date is reasonable given that PHS dentists had to obtain approvals, a new dentist assumed Alster's care, and the surgery had to be scheduled at an outside hospital. In addition, Alster does not dispute that he never complained of eating difficulties in the interim. His present complaints are also undermined by his consumption of the Kosher meals provided at his request. Under these circumstances, there is no evidence that PHS unreasonably delayed dental treatment or was deliberately indifferent to Alster's dental needs.

Accordingly, this Court grants summary judgment on Alster's § 1983 claims against the State and Municipal Defendants for inadequate dental care.

### 3. *Hearing Care*

Alster contends (1) Rikers staff and State audiologist Serhan provided him with uncomfortable hearing aids lacking certain features, (2) OTO Health manufactured these allegedly deficient hearing aids, (3) Rikers sometimes delayed distribution of hearing aid batteries, (4) Thomas inadequately explained the proper care for his hearing aids, and (5) Serhan failed to recommend a transfer based on his 2005 and 2006 hearing tests. Defendants do not contest that diminished hearing is a serious medical need under the Eighth Amendment.

"[T]he fact that an inmate ... did not get the level of medical attention he preferred" does not alone constitute deliberate indifference. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Even if Alster's hearing aids were uncomfortable or lacked certain features, he submits no evidence that he was unable to function at Green Haven or Rikers because of these alleged deficiencies. *See Chance*, 143 F.3d at 698 (no Eighth Amendment claim may lie "[s]o long as the treatment given is adequate"). With respect to Alster's claims regarding hearing aid instructions and batteries, these are the sort of relatively minor "lapse[s] in prison medical care" that, without more, cannot "rise to the level of a constitutional violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir.2003); *see Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Finally, as to the transfer recommendation, Serhan deemed Alster's 2005 and 2006 hearing tests to be inaccurate because he suspected Alster was feigning deafness. Although Alster may take a different view, a prisoner's disagreement with a physician's diagnosis is not an adequate ground for a § 1983 claim. *Estelle*, 429 U.S. at 106, 97 S.Ct. 285. There is no evidence that Serhan "intentionally denied him needed medical care over a period of time or completely withheld medical care." *Joyner*, 195 F.Supp.2d at 504. To the contrary, Serhan regularly evaluated Alster, performed

several hearing tests, provided two sets of hearing aids, and sent them in for repairs when needed. *See Gonzalez,* 2008 WL 2385948, at *8 (no deliberate indifference where "plaintiff was evaluated and treated for hearing loss and ear pain complaints on numerous occasions"). Accordingly, this Court grants summary judgment on Alster's § 1983 claims against the State and Municipal Defendants for inadequate hearing care.

### 4. *General Medical Care*

 Alster contends Rikers waited two days after he complained of abdominal pain to take him to the hospital and failed to transport him to appointments. With respect to the first complaint, Alster presents no evidence that any Defendant deliberately delayed treatment or disregarded an excessive risk to his health. *Hunt,* 865 F.2d at 201. When Alster's abdominal pain persisted, he was taken to the hospital and made a full recovery. As for the failure to transport, Alster details only one such incident, when Officer Bonito refused to take him to an appointment. "[A]bsent special circumstances indicating an evil intent, recklessness, or at least deliberate indifference," this amounts to an "isolated omission to act" that "[can]not support a claim under section 1983." *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985).

 Alster also claims that after his return to Green Haven, Dr. Mamis consistently denied him adequate medical care. The record belies Alster's claims. In fourteen months, Dr. Mamis arranged for at least twelve specialist consults and prescribed physical therapy and medication for Alster's back pain. Although Alster takes issue with Dr. Mamis twice deviating from other physicians' prescriptions, the record reflects that Dr. Mamis did so based on his examination of Alster and the availability of medications at the pharmacy. Where the care provided is otherwise adequate, "[d]isagreements over medications" and "forms of treatment" are "not adequate grounds for a Section 1983 claim," for "[t]hese issues implicate medical judgments." *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285). Accordingly, this Court grants summary judgment on Alster's § 1983 claim based on general medical care.

### B. *Conditions of Confinement*

 In addition to inadequate medical treatment, inhumane conditions of confinement violate the Eighth Amendment's prohibition on cruel and unusual punishment. *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002). The standard for an inhumane conditions claim is identical to that for inadequate medical treatment—objectively, "the prison officials' transgression was 'sufficiently serious' "; and subjectively, "the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or safety.' " *Phelps,* 308 F.3d at 185 (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970). Under the objective element, while the Constitution "does not mandate comfortable prisons," inmates may not be denied "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). States may not deprive inmates of their "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "Nor may prison officials expose prisoners to conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " *Phelps,* 308 F.3d at 185 (quoting *Helling,* 509 U.S. at 35, 113 S.Ct. 2475).

### 1. *State Prison Conditions*

 Alster claims intolerable conditions of confinement at Green Haven based

on Drs. Koenigsmann, Bernstein, and Mamis's refusal to place him in a wheelchair-accessible cell with grab bars and provide a wheelchair-accessible shower, or, in the alternative, to place him in the Unit for the Physically Disabled. The "minimal civilized measure of life's necessities" mandated under the Eighth Amendment include accommodation of the "essential bodily functions of toileting and showering." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Rivera v. Dyett,* No. 88 Civ. 4707(PKL), 1992 WL 233882, at *8 (S.D.N.Y. Sept. 10, 1992). Alster maintains that because of his deteriorating ability to stand or walk, he could not use the showers. These allegations are substantiated by contemporaneous letters from his attorney and numerous health records documenting Alster's worsening balance and progressive difficulties ambulating from his wheelchair. There is also evidence that Alster's access to toilet facilities was impaired. Such unsanitary conditions, if true, are "contrary to contemporary standards of decency" and amount to the infliction of pain "totally without penological justification." *Hope v. Pelzer,* 536 U.S. 730, 737, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Helling,* 509 U.S. at 32, 113 S.Ct. 2475 (citing *Estelle,* 429 U.S. at 104, 97 S.Ct. 285).

Alster has also raised a fact issue as to whether prison officials were deliberately indifferent to these conditions. The State Defendants contend that because they provided certain accommodations, Alster cannot establish a culpable state of mind. This misapprehends the law. An official's provision for certain of an inmate's basic needs cannot immunize him where he deprives that inmate of other life necessities guaranteed by the Eighth Amendment. Courts have long recognized that furnishing an inmate with a wheelchair is insufficient where the State fails to provide access to basic facilities. *See Shariff v. Coombe,* 655 F.Supp.2d 274, 298–99

(S.D.N.Y.2009) (deliberate indifference where wheelchair-bound inmates could not access bathroom facilities); *Montalvo v. Koehler,* No. 90 Civ. 5218(LJF), 1992 WL 396220, at *5 (S.D.N.Y. Dec. 21, 1992) (deliberate indifference where wheelchair-bound inmate could not access shower). Alster's numerous requests, his attorney's letters, and prison records of Alster's worsening condition create a fact issue whether Defendants disregarded Alster's conditions. Accordingly, this Court denies summary judgment on Alster's § 1983 claims against Drs. Koenigsmann, Bernstein, and Mamis for failure to provide a wheelchair-accessible cell with grab bars and wheelchair-accessible shower, or, in the alternative, placement in the Unit for the Physically Disabled.

### 2. City Prison Conditions

Alster claims that certain conditions at Rikers violated the Eighth Amendment—the lack of grab bars in his dormitory, insufficient space between beds, restricted access to television, assistance by untrained inmates with putting on jumpsuits, removal of certain parts from his wheelchair, and unsafe transport vehicles. As an initial matter, the NYCDOC accommodated essential bodily functions as required under the Eighth Amendment by placing Alster in wheelchair-accessible housing with wheelchair-accessible showers. *See Hudson,* 112 S.Ct. at 1000; *Rivera,* 1992 WL 233882, at *8. While the lack of grab bars and cramped spacing between beds may constitute less than ideal housing conditions, Alster does not claim he suffered injury as a result. *See Farmer,* 511 U.S. at 833, 114 S.Ct. 1970. Restricted access to television and the aid of untrained inmates with dressing are not deprivations that deny a basic human need or pose an unreasonable risk of serious harm. *See Helling,* 509 U.S. at 32, 35, 113 S.Ct. 2475; *see also Atiyeh v. Capps,* 449 U.S.

1312, 1315–16, 101 S.Ct. 829, 66 L.Ed.2d 785 (1981) (observing as to prisoners' intolerable conditions claims that "nobody promised them a rose garden; and I know of nothing in the Eighth Amendment which requires that they be housed in a manner most pleasing to them") (Rehnquist, J.).

Alster's wheelchair claims fail because he sets forth no evidence that any prison official knew he "face[d] a substantial risk of serious harm" from his wheelchair yet "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847, 114 S.Ct. 1970. Rather, Alster concedes Rikers removed certain parts out of safety considerations, and the record "indicates that [Alster's] wheelchair complaints were investigated and new equipment or other repairs were made to [his] wheelchair[ ] when deemed medically appropriate." *Johnson v. Goord*, No. 01 Civ. 9587(PKC), 2004 WL 2199500, at *9 (S.D.N.Y. Sept. 29, 2004).

■ With respect to Rikers' transport vehicles, Alster adduces evidence of only one injury to his arm. Because hospital records reveal no fractures or dislocation, this injury is not sufficiently serious to meet the objective prong of the Eighth Amendment standard. *See Allah v. Goord*, 405 F.Supp.2d 265, 276 (S.D.N.Y.2005) (objective element met only where wheelchair-bound prisoner suffered serious head and back injuries in transit).

Accordingly, this Court grants summary judgment on Alster's § 1983 claims against the Municipal Defendants premised on his conditions of confinement.

### C. *Excessive Force*

■ The Eighth Amendment protects inmates against the use of excessive force by prison guards and officials. *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). Nevertheless, the force Alster described in his deposition—that Bonito kicked him twice and frequently kicked his wheelchair—is "not sufficiently serious or harmful to reach constitutional dimensions." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir.1997). Significantly, Alster "does not maintain that he experienced any pain or injury as a result of the physical contact." *Boddie*, 105 F.3d at 862. As for Bonito's use of profanity and racial epithets, "threats or verbal harassment, without any injury or damage," are not cognizable under § 1983. *Ramirez v. Holmes*, 921 F.Supp. 204, 210 (S.D.N.Y. 1996). Accordingly, because this Court finds the degree of force used to be *de minimis* as a matter of law, *Griffin v. Crippen*, 193 F.3d 89, 92 (2d Cir.1999), summary judgment is appropriate on Alster's excessive force claims.

### VI. *ADA Claims*

#### A. *Individual Capacity Claims*

■ Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA does not provide for individual capacity suits against state or city officials. *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir.2001). Accordingly, Alster's ADA claims against the Municipal Defendants in their individual capacities are dismissed.

#### B. *State, City & Official Capacity Claims*

■ Although unconsenting States are generally immune from suit in federal court, *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), Congress may abrogate sovereign immunity to enforce the substantive rights

guaranteed by the Fourteenth Amendment, pursuant to Section Five of that Amendment. *Tennessee v. Lane,* 541 U.S. 509, 518, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004). Congress has abrogated States' immunity from Title II claims. *See* 42 U.S.C. § 12202. The Supreme Court has affirmed the constitutionality of that abrogation in part—"insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia,* 546 U.S. 151, 159, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006). In considering whether a Title II damages action against a State may proceed, the court must determine "on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Georgia,* 546 U.S. at 159, 126 S.Ct. 877.

"[T]o establish a violation under the ADA, the plaintiff[ ] must demonstrate that (1)[he] is [a] 'qualified individual[ ]' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiff[ ] w[as] denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or w[as] otherwise discriminated against by defendants, by reason of plaintiff['s] disabilities." *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003). For purposes of these motions, Defendants concede that Alster is a qualified person with disabilities and that they are public entities subject to the ADA.

### 1. *Reasonable Accommodation Standard*

The ADA not only protects against disparate treatment but also creates an affirmative duty to provide reasonable accommodations for the disabled. *Henrietta,* 331 F.3d at 276–77. The Department of Justice regulations implementing Title II direct that "public entit[ies] shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). However, "in no event is the entity required to undertake measures that would impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the services." *Lane,* 541 U.S. at 531–32, 124 S.Ct. 1978. Moreover, a plaintiff must demonstrate that any denial of benefits occurred "because of the disability." *Henrietta,* 331 F.3d at 278.

### 2. *State Prison: Wheelchair-Accessible Cell & Showers*

"The ADA requires only that a particular service provided to some not be denied to disabled people." *Rodriguez v. City of N.Y.,* 197 F.3d 611, 618 (2d Cir. 1999). It is undisputed that Drs. Koenigsmann and Bernstein did not grant Alster's requests for a wheelchair-accessible cell or shower, or, in the alternative, placement in the Unit for the Physically Disabled. Alster submits evidence that as a result of these decisions, he was prevented from showering at Green Haven. If true, this amounts to exclusion from participation in services of a public entity by reason of disability. *See* 42 U.S.C. § 12132; *Carrasquillo v. City of N.Y.,* 324 F.Supp.2d 428, 443 (S.D.N.Y.2004).

The State Defendants contend that even if Alster can establish an ADA violation, he cannot bring a damages action unless he shows the violation was motivated by discriminatory animus or ill will. For this principle, they rely on *Garcia v. State Univ. of N.Y. Health Scis. Ctr.*, 280 F.3d 98 (2d Cir.2001), in which the Court of Appeals treated Title II claims as grounded in the Equal Protection Clause. 280 F.3d at 109. The Court of Appeals held that to comport with Congress's § 5 authority, Title II monetary claims against the State could be maintained only if the plaintiff established "discriminatory animus or ill will based on the plaintiff's disability." *Garcia*, 280 F.3d at 111.

However, the Supreme Court has upheld abrogation of sovereign immunity for certain Title II claims not grounded in the Equal Protection Clause and reasoned that through Title II, Congress sought to enforce not only Equal Protection but "a variety of other basic constitutional guarantees." *Lane*, 541 U.S. at 522–23, 124 S.Ct. 1978. Following *Garcia*, the Supreme Court in *United States v. Georgia* reaffirmed its position by finding sovereign immunity abrogated "for conduct that actually violates the Fourteenth Amendment," without requiring a showing of discriminatory animus. 546 U.S. at 159, 126 S.Ct. 877. In *Georgia*, the Supreme Court considered, as here, a prisoner's claims of failure to accommodate his disability-related needs, conduct that violates the Eighth Amendment's prohibition of cruel and unusual punishment as incorporated in § 1 of the Fourteenth Amendment. 546 U.S. at 156, 126 S.Ct. 877. Moreover, in the context of involuntary commitment, the Court of Appeals recently found "*Garcia* only applies to Title II claims based on Equal Protection," so claims "based solely on substantive due process" are properly "decided ... under *Georgia*." *Bolmer v. Oli-*

*veira*, 594 F.3d 134, 147 (2d Cir.2010). Thus, Alster need not show discriminatory animus here.

Because Alster's prison conditions, if true, violated the Eighth and Fourteenth Amendments, the State's sovereign immunity from Title II claims is abrogated under *Georgia*, 546 U.S. at 157, 159, 126 S.Ct. 877. Accordingly, this Court denies summary judgment on Alster's ADA claims against NYSDOCS for failure to provide a wheelchair-accessible cell and shower, or, in the alternative, placement in the Unit for the Physically Disabled.

██ As to Alster's official capacity claims, "the State is the real party in interest for [a] plaintiff's claims against the individual defendants in their official capacities." *Fox v. State Univ. of N.Y.*, 497 F.Supp.2d 446, 451 (E.D.N.Y.2007). Where, as here, a plaintiff may proceed on his ADA claims against the State entity directly, courts in this Circuit "dismiss[ ] the official capacity claims because they [are] redundant of the claims against the government entity." *Fox*, 497 F.Supp.2d at 451; *Hallett v. N.Y. State Dep't of Corr. Servs.*, 109 F.Supp.2d 190, 199–200 (S.D.N.Y.2000) ("because plaintiff is able to assert his ADA ... claims against DOCS directly," there was "no justification for allowing ... ADA [ ] claims against the individual defendants in their official capacities"); *Candelaria v. Cunningham*, No. 98 Civ. 6273(LAP), 2000 WL 798636, at *3 (S.D.N.Y. June 20, 2000) ("[T]here is no need for official capacity litigation when an individual can sue a government entity directly."). This Court agrees with these holdings and dismisses Alster's ADA claims against the individual Defendants in their official capacities.

### 3. City Prison: Accommodations for Walking/Balance Disability

██ The record demonstrates that the Municipal Defendants provided reasonable

accommodations for Alster's balance disorder and walking disability by housing him in a wheelchair-accessible unit with wheelchair-accessible showers, inmate assistance, and available medical staff. Although the lack of dormitory grab bars, insufficient space between beds, inmate aid with dressing, and inadequately equipped transport vehicles "may have been less than ideal," Alster has not presented evidence that these deficiencies "denied him access to the benefits of services, programs or activities" at Rikers. *Cole v. Goord*, No. 05 Civ. 2902(GEL), 2009 WL 2601369, at *11 (S.D.N.Y. Aug. 25, 2009). While Alster complains of restricted access to television, "[h]e does not allege that he was prevented altogether from accessing [it]," for he also asserts he had difficulty hearing the television over the noise in the common room. *Carrasquillo*, 324 F.Supp.2d at 443. In addition, the removal of certain parts from Alster's wheelchair does not constitute a denial of benefits "because of a disability"—rather, Alster concedes that Rikers acted based on NYC-DOC security policies. *See Henrietta*, 331 F.3d at 278. Accordingly, this Court grants summary judgment on Alster's ADA claims against the Municipal Defendants for failure to accommodate his walking and balance disability.

#### 4. *Accommodations for Hearing Disability*

 Alster's claims under the ADA for failure to accommodate his hearing disability also fail. Because Alster adduces no evidence that the hearing aids provided did not function, that they caused discomfort or lacked certain features does not constitute an ADA violation. "[A]s long as [Defendants] reasonably accommodated

[Alster's] disability, they need not provide him with the exact accommodations he demanded." *Cole*, 2009 WL 2601369, at *8. In addition, Alster makes no showing that delays in battery distribution and unsatisfactory instructions occurred "because of his disability," rather than as a result of the limitations of the prison medical system. The same is true for Serhan's decisions not to request a transfer in 2005 and 2006. *See Doe v. Pfrommer*, 148 F.3d 73, 84 (2d Cir.1998) (no cognizable claim under the ADA where inmate challenges the "substance of the services provided"); *Espinal v. N.Y. State Dep't of Corr. Servs.*, No. 06 Civ. 596(LES), 2009 WL 799951, at *6 (N.D.N.Y. Mar. 24, 2009) ("[I]t is not a violation of the ADA to deny an inmate's request for reasonable accommodations because of a reason other than his disability."). Moreover, once Serhan concluded Alster's hearing impairment was significant, he responded with "an entirely reasonable accommodation by transferring [Alster] to a facility" better equipped to meet Alster's needs. *Cole*, 2009 WL 2601369, at *9. Accordingly, this Court grants Defendants' motion for summary judgment on Alster's ADA claims premised on hearing accommodations.

### VII. *Interference with Attorney Visits*

 An inmate's right to counsel to assist in his defense during a criminal prosecution implicates "both the due process right of access to the courts and the Sixth Amendment right to counsel."[1] *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir.2001). To meet the requirements of due process, "[i]nmates must have a *reasonable* opportunity to seek and receive the assistance of attorneys. Regulations

---

1. Alster was sentenced to twenty years to life in 2001. However, his access-to-counsel claims arise from attorney visits at Rikers in 2004, concerning separate, pending criminal charges to which he later pled guilty. (NYC

Defs. 56.1 Stmt. ¶ 1; Silverberg Decl. Ex. L: Decision & Order, *People v. Stephen Alster*, Ind. # 2979/ 2003 (N.Y.Sup.Ct. July 26, 2005).)

and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (emphasis added), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). Similarly, "prison regulations restricting pretrial detainees' contact with their attorneys" violate the Sixth Amendment "where they *unreasonably* burden[ ] the inmate's opportunity to consult with his attorney and to prepare his defense." *Benjamin*, 264 F.3d at 187 (emphasis added). NYCDOC's requirement that inmates wear jumpsuits during attorney visits is a reasonable "polic[y] and practice[ ] that in [its] judgment [is] needed to preserve internal discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). By terminating Alster's attorney visit because he was not wearing his jumpsuit, Davis and Lockhart complied with standard security procedures that "ensure the safety of inmates and corrections personnel and [ ] prevent escape." *Bell*, 441 U.S. at 547, 99 S.Ct. 1861. Even if on two occasions Alster was unable to secure assistance to put on the jumpsuit, he concedes that he met with his attorney frequently and sets forth no evidence that his legal defense was impaired. Accordingly, this Court grants summary judgment on Alster's claims premised on interference with attorney visits.

## VIII. *Exercise of Religion*

■ Prisoner religious liberty claims implicate the Free Exercise Clause of the First Amendment and section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *See Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir.2006). Although prisoners "retain some measure of the constitutional

protection afforded by the First Amendment's Free Exercise Clause," their right to free exercise of religion must be "balanced against ... the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir.2003) (internal quotations omitted). To establish a free · exercise claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274–75. The RLUIPA provides that the government shall not "impose a substantial burden on the religious exercise" of a prisoner, unless it furthers "a compelling governmental interest" through "the least restrictive means." 42 U.S.C. § 2000cc–1(a).

Alster claims that (1) Maria and an unidentified officer refused to transport him to one religious service; and (2) his Kosher meals were repetitive, improperly handled, sometimes forgotten, and not provided in the clinic. These claims fail under both the Free Exercise Clause and the RLUIPA.

■ NYCDOC's transport procedures requiring inmates to wear jumpsuits and comport with scheduled pick-up times do not "impinge[ ] on inmates' constitutional rights" under the Free Exercise Clause. *Pugh v. Goord*, 571 F.Supp.2d 477, 497 (S.D.N.Y.2008). This minimal burden is "reasonably related to legitimate penological interests," including regularity of prison procedures, management of transport of numerous inmates, and security enforcement. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Likewise, Alster cannot establish a "substantial burden" under the RLUIPA because he adduces no evidence that these procedures "put[ ] substantial pressure on [him] to modify his behavior

and to violate his beliefs." *McEachin v. McGuinnis*, 357 F.3d 197, 202 n. 4 (2d Cir.2004).

 With respect to Alster's Kosher meals, although "a prisoner has a right to a diet consistent with his or her religious scruples," *Ford*, 352 F.3d at 597, some "inconveniences" to religious practice in the prison system are "so trivial that they are most properly ignored." *McEachin*, 357 F.3d at 203 n. 6. It is undisputed that the Municipal Defendants generally provided Kosher meals to Alster. The lack of menu diversity, occasional oversights, and unavailability of meals in the clinic do "not constitute a violation under the First Amendment or RLUIPA, as any violation was *de minimis.*" *Tafari v. Annets*, No. 06 Civ. 11360(GBD)(AJP), 2008 WL 2413995, at *16 (S.D.N.Y. June 12, 2008). Accordingly, this Court grants summary judgment on Alster's religious liberty claims.

IX. *Qualified Immunity*

 Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "A government official is entitled to qualified immunity from suit for actions taken as a government official if (1) the conduct attributed to the official is not prohibited by federal law, constitutional or otherwise; (2) the plaintiff's right not to be subjected to such conduct by the official was not clearly established at the time of the conduct; or (3) the official's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was

taken." *Cuoco v. Moritsugu*, 222 F.3d 99, 109 (2d Cir.2000) (citations omitted).

 This Court has found that certain conditions at Green Haven, if proven at trial, violate the Eighth Amendment and the ADA. Moreover, a prisoner's rights to constitutionally adequate conditions of confinement and reasonable accommodations for disabilities are clearly established rights under federal law. *See, e.g., Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (Title II of the ADA applies to prisoners); *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (conditions of confinement). To find an official's actions objectively unreasonable, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Lauro v. Charles*, 219 F.3d 202, 214 (2d Cir.2000). That is, " 'in the light of pre-existing law the unlawfulness [of the official's conduct] must be apparent.' " *Lauro*, 219 F.3d at 214 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

 "Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir.1999). Here, "issues of fact exist concerning the severity of [Alster's] condition and the state of mind of the individual Defendants that are material to a determination of reasonableness." *Sereika v. Patel*, 411 F.Supp.2d 397, 407 (S.D.N.Y.2006). Accordingly, this Court denies Defendants' motion for summary judgment on qualified immunity grounds.

*CONCLUSION*

For the foregoing reasons, this Court denies the State Defendants' motion for summary judgment on Alster's § 1983

claims against Dr. Carl Koenigsmann, Dr. Frederick Bernstein, and Dr. Harry Mamis, as well as his ADA claims against NYS-DOCS, for failure to provide a wheelchair-accessible cell with grab bars and wheelchair-accessible shower, or, in the alternative, placement in the Unit for the Physically Disabled. In all other respects, the State Defendants' motion for summary judgment is granted and the claims are dismissed. The Municipal Defendants' motion for summary judgment is granted in all respects. The Clerk of the Court shall terminate all pending motions. This Court will conduct a status conference on September 23, 2010, at 11:15 a.m.

SO ORDERED.